UNITED STATES of America

v.

Abraham GLANTZMAN, Appellant
in 18875, et al.
Appeal of Irwin H. MELTZER, in

No. 18899.

Nos. 18875, 18899.

United States Court of Appeals,
Third Circuit.

Argued May 4, 1971.

Decided July 23, 1971.

Van Dusen, Circuit Judge, concurred in part and dissented in part and filed opinion.

Leon H. Kline, Philadelphia, Pa., for Abraham Glantzman.

Gregory J. Castano, Harrison, N. J. (Krivit & Krivit, Jersey City, N. J., on the brief) for Irwin H. Meltzer.

Rene Hollyer, Asst. U. S. Atty., Newark, N. J. (Herbert J. Stern, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before KALODNER, VAN DUSEN and ALDISERT, Circuit Judges.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

Abraham Glantzman, owner of an employment agency, and Irwin H. Meltzer, head of the agency's unskilled labor department, were found guilty by a jury of falsifying government documents in prosecutions brought under 18 U.S.C. §

1001 and 18 U.S.C. § 2.[1] Although several reasons for reversing these convictions were submitted and have been considered,[2] we have concluded that only the question of sufficiency of evidence merits discussion.

It is conceded that the Department of Labor and the Immigration and Naturalization Service were furnished false information on Labor Department Form 575 A, which were processed by the employment agency in behalf of three aliens, Newman, Quamina and Martin. The forms represented that each applicant was seeking employment as a hospital orderly and had the requisite qualifications and experience for the position. The requested position was one certifiable by the Labor Department as available for aliens. None of the three aliens in fact possessed the necessary prerequisites for the position. The

question devolves, therefore, to whether there was sufficient evidence presented for a jury to conclude that Glantzman and Meltzer knowingly participated in filing the false statements.

Conceding that Glantzman did not personally prepare the 575 A forms in question, the government emphasizes his overall supervision of the employment agency and his promulgation of its standard operating procedures. These included having the alien sign the 575 A form in blank at the time of the interview, the assignment of duties to the various employees, numbering from 15 to 25 during the period in question, and instructing the employees that job specifications on form A must always conform to the job description contained on form B supplied by the prospective employer.[3]

---

1. 18 U.S.C. § 1001 provides:

   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   18 U.S.C. § 2 renders aiders and abettors liable as principals:
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
   The indictment contained eight counts. Appellant Glantzman was charged on all eight; appellant Meltzer was charged on counts III through VIII. Counts I and II were severed and subsequently dismissed. The jury returned verdicts of guilty as to Glantzman and Meltzer on all six remaining counts.

2. Glantzman criticized certain of the court's instructions to the jury.

3. Forms ES–575 A and B contain two conspicuous warnings. The forms are headed by the following notice:
   READ THIS NOTICE BEFORE EXECUTING FORMS ES–575A AND B. To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another so to do is a felony punishable by $10,000 fine or five years in the penitentiary, or both (18 U.S.C. § 1001). Any alien, prospective employer or any person acting on behalf of such alien or employer, who knowingly makes any misrepresentation concerning the alien, or his prospective employment including such matters as wages, hours, or the occupation in which an alien will be employed, or any person who falsely represents, in the execution of this form, that he is offering the alien employment as the prospective employer of such alien, will be prosecuted to the fullest extent of the law.
   The form requires the alien to "[d]eclare that all of the statements made in this document are true, complete, and correct to the best of my knowledge and belief." Under the place for signature, the form again contains the warning: "Severe penalties are provided by law for knowingly and willfully falsifying or concealing a material fact or using any false document in the submission of his APPLICATION FOR ALIEN EMPLOYMENT CERTIFICATION" (U.S. Code, Title 18, Sec. 1001).

In the three specific job applications involved in these proceedings, the prospective employer was the Hilltop Nursing Home. Its director, Frank M. Hill, executed form B, the appropriate requisition, for the position of hospital orderly.[4] The completed forms were submitted to the Labor Department, but were rejected in May, 1968. Glantzman conceded that on May 23, 1968, he personally transported thirteen applications to Washington, including those of Newman, Quamina and Martin, for the purpose of obtaining reconsideration. Glantzman categorically denied, however, that he had personal knowledge of the false information contained therein.

The government contends that proof of personal knowledge was established by a series of four letters between Glantzman and the New Jersey State Employment Service. One is a carbon copy of a letter from the manager of the state service stating that the position of kitchen worker requested for Newman was non-certifiable.[5] A second letter from the same manager disclosed that the application form for a new position for Newman and another showed alterations, thereby requiring "you to submit new forms ES 575 A & B signed by the respective parties."[6] The other two are mimeographed form letters from Glantzman enclosing "an application for Alien Employment Service" for Newman[7] and Quamina.[8]

To the totality of its evidence the government would have us apply the teaching of Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), in which, despite no direct evidence tying the manager to the false documents submitted to the government by his business office, there was evidence that he had been "the promoter of a long and persistent scheme to defraud, [and] that the making of false invoices was a part of that project." The Court held that there was sufficient circumstantial evidence to convict him as an aider and abettor. Glantzman, however, argues that his personal activity and that of his agency cannot be equated with the facts of *Nye & Nissen*, and at best amounted to "mere suspicious circumstances" rejected by this court in United States v. Heithaus, 391 F.2d 810 (3rd Cir. 1968), as an insufficient quantum of proof to sustain a conviction.

■ Although the issue is close, we conclude that it must be resolved in favor of the defendant Glantzman. The size of the employment office operation with the large number of employees utilized in processing applications militates against imputing constructive knowledge to the owner. Although the correspondence to and from the state employment service indicates that he had personal knowledge of the processing of Newman's and Quamina's applications, it was incumbent upon the government to prove that Glantzman also knew of the applicants' lack of qualifications for the orderly positions. Those facts were not apparent on the face of the final forms. Absent such proof it is as plausible to conclude that Glantzman believed the applicants did possess qualifications for the hospital orderly positions as it is to charge him with knowledge of the fraudulent circumstances.[9] At best, all

---

4. Frank M. Hill, the director of Hilltop, was also named as defendant in counts III through VIII of the indictment. He was convicted on counts IV, VI, and VII, and did not appeal.

5. Government exhibit 18.

6. Government exhibit 21.

7. Government exhibit 23.

8. Government exhibit 22.

9. [T]o warrant a conviction on circumstantial evidence the facts and circumstances established by such evidence must be of such a character as to produce a moral certainty beyond a reasonable doubt, but need not be absolutely incompatible with innocence. However, guilt must be proved and not be conjectural, and cannot rest solely on suspicion or surmise. Commonwealth v. Feinberg, 211 Pa.Super. 100, 234 A.2d 913, 919 (1967). *See* United States v. Heithaus, *supra*, 391 F.2d at 811.

the government proved was that Glantzman knew, or should have known, of prior applications for uncertified positions.

We hold that the government failed to meet its burden of establishing the elements of the crime by proof beyond a reasonable doubt. The judgment of conviction against Glantzman will not be permitted to stand.

■ Meltzer does not stand in the same position, for there was evidence he knew that the applications of Newman and Quamina were defective. Newman testified to two meetings with Meltzer at which he told Meltzer that he had neither previous work experience nor the skills required for the hospital orderly position. There was also correspondence over Meltzer's signature attempting to certify Newman as a kitchen worker, and not hospital orderly, with the state employment service.

Quamina said Meltzer was introduced to him as the "boss," that he discussed with Meltzer a position of laundry worker, and not hospital orderly. It is a reasonable inference that, having interviewed the applicant, Meltzer was apprised of the information contained in his office's blue form—a job application filled out by the applicant as the first step in the office procedure—which disclosed that Quamina's previous work experience was that of porter in Port of Spain, Trinidad, that he was applying for the position of porter and, indeed, his second choice position was also that of porter.

In contrast with Glantzman's role, Meltzer's participation was not limited to that of executive; his duties included the interviewing of at least two of these three applicants, and this he did more than once. The circumstances of his personal involvement with Newman and Quamina are sufficient to impute knowledge of their lack of qualification. To this essential ingredient the government added evidence that Meltzer was in charge of all applications of unskilled workers for permanent residence, that he was responsible for the completion of 575 A and B forms for unskilled applicants, and that his secretary typed substantially all unskilled job applications.

We have concluded that there was sufficient evidence supporting the government's theory that Meltzer knew the information set forth on Forms 575 A and B at a time when he also knew that information concerning Newman's and Quamina's qualifications. Under these circumstances, there was sufficient evidence to support a conviction as an aider and abettor under the four counts involving these two aliens.

The evidence supporting the remaining two counts, which relate to Meltzer's participation with the alien Martin, is not commensurably incriminating. Some correspondence between Meltzer and the alien's prospective employer was disclosed. But we find the record devoid of sufficient evidence to impute to Meltzer the requisite knowledge of Martin's lack of qualifications. Absent such proof there can be no conviction on either count VI and VII.

The judgment of conviction against appellant Glantzman will be reversed. The judgment of conviction against appellant Meltzer on counts III, IV, V and VI will be affirmed and the judgment of conviction in counts VII and VIII will be reversed.

VAN DUSEN, Circuit Judge (concurring in part and dissenting in part).

I concur in the affirmance of the judgment of conviction against Meltzer on Counts III–VI and in the reversal of the judgment of conviction against him on Counts VII and VIII. I dissent, respectfully, only from the reversal of the judgment of conviction against Glantzman on Counts III–VIII by the majority on the ground that "the government failed to meet its burden establishing the elements of the crime by proof beyond a reasonable doubt."[1] As this

1. See, particularly, testimony of witnesses Bell (N.T. 44–112), Mark (N.T. 310–343), Quamina (N.T. 188 ff.), Newman (N.T. 345 ff.), Martin (N.T. 424 ff.), Gordon

court has consistently held, the evidence must be viewed in the light most favorable to the Government on this issue. *See* United States v. Carlson, 359 F.2d 592, 597 (3d Cir.), cert. denied sub nom. Bonomo v. United States, 385 U.S. 879, 87 S.Ct. 161, 17 L.Ed.2d 106 (1966); United States v. Provenzano, 334 F.2d 678, 683–684 (3d Cir.), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).

Mark testified that most individuals applying to Glantzman's sole proprietorship known as Foreign Employment Service (hereinafter F.E.S.), in order to be approved for permanent residence, were from the West Indies and had come to this country on visitors' visas, using this language at N.T. 311–12:

"Q Now, did you ever discuss the fact that the majority of these people were here on a visitor's visa with Mr. Glantzman?

"A Oh, yes, yes. Well, the guidelines were laid down to me, you know, that these people would be mostly visitors, and that I should make it clear to them—I should make it clear to them that as visitors they were accepting employment at their own risk.

"Q What do you mean by that?

"A Yes, that they would—that they were committing a breach of the immigration laws or regulations, something like that. They were committing a breach.

"Q Who instructed you?

"A Oh, Mr. Glantzman made that quite clear.

"Q That you were to advise these people?

"A Yes. I was to advise them.

"Q To that effect?

"A Yes." [2]

In addition to the testimony that under Glantzman's instructions the 575 A forms were signed regularly by the aliens in blank and then filled in by the F.E.S. employees,[3] even though they did not describe jobs which the alien could perform, Newman testified that he never signed the 575 A form submitted by F.E.S. on his behalf (N.T. 358, 359 & 366), and which was taken to the Department of Labor at Washington, D. C., by Glantzman to expedite its handling (N.T. 44–49). Furthermore, there is evidence that Newman told F.E.S. he was not working as an orderly but as a

(N.T. 472 ff.), Butler (N.T. 659, 666 & 780), Glantzman (N.T. 861 ff.), Hill (N.T. 965, 987 ff.), and Meltzer (N.T. 1084 ff.).

2. At pages 312 and 337 Mark testified:
"As I said, he made it clear to me that these people who came as visitors were not permitted to work, were not permitted to accept employment, and therefore I should make that very clear to them because the process was two-fold, one was that our service to them—the the agency's service to them was two-fold, one to find them a job, and secondly to put through their papers for the purpose of getting permanent residence.

\* \* \* \* \*

\* \* \* That is, we were going to seek a position for them but that the responsibility—that is, for accepting employment, was his, that is to say that he was doing it at his risk, as there was a breach involved.

"THE COURT: A breach of what?

"THE WITNESS: The Immigration Regulations on a visitor. I mean,

he was a visitor and as such he was not permitted to accept employment.

"THE COURT: Did you tell the applicant?

"THE WITNESS: Oh, yes.

"THE COURT: That in getting him a job if he accepted the job it would be a violation of the Immigration laws?

"THE WITNESS: Yes. Yes, it would be a violation.

"THE COURT: You told him that?

"THE WITNESS: Yes."

See, also, testimony at N.T. 110 of Mr. Bell, Labor Department Supervisor reviewing applications for alien employment certifications that have been denied by regional offices.

3. See N.T. 666, 871, 1086–87. This procedure was adopted even though the form specified that the signatory declared "that all statements [on it] were true, complete, and correct." Meltzer testified that Glantzman initiated this procedure (N.T. 1086–87).

kitchen worker (N.T. 379, 380 & 388).[4] Similarly, there is ample evidence from which the jury could find that F.E.S. and its sole proprietor, Glantzman, knew that Quamina was employed to work in the laundry or as a porter but not as an orderly (N.T. 217, 263, Exhibit 29 and N.T. 992).

Glantzman had the final say on policies at F.E.S. (N.T. 689, 780–81). He conceded that forms prepared in his office were prepared "in accordance with my direction and order" (N.T. 928) and that he established the operating procedures for F.E.S. (N.T. 887).

Under these circumstances, I believe this language of Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), is applicable:

" * * * [T]here is circumstantial evidence wholly adequate to support the finding of the jury that Moncharsh aided and abetted in the commission of those offenses. Thus there is evidence that he was the promoter of a long and persistent scheme * * *, that the making of false invoices was a part of that project, that the makers of the false invoices were Moncharsh's subordinates, that * * * [he] was the chief owner of the business, that he was the manager of it, * * * that he had charge of the office where the invoices were made out.

"Those activities extended throughout the period when the substantive crimes were committed. * * *

"We see therefore no reason to exculpate him as an aider and abettor."

Similarly, this language from this court's decision in *Provenzano, supra,* seems applicable (334 F.2d at 692):

"In the instant case the evidence established Provenzano's essential participation in a scheme. * * * There was sufficient evidence to connect Communale as well as Castellito with Provenzano in a violation of section 1951. Compare Nye & Nissen v. United States, 336 U.S. 613, 619–620, 69 S.Ct. 766, 769, 770, 93 L.Ed. 919 (1949). * * * The jury was entitled to draw any reasonable inference from the evidence in favor of the United States and against Provenzano."[5]

---

4. Also, Martin testified to the same effect (see N.T. 451 and Exhibit 42).

5. In United States v. Heithaus, 391 F.2d 810 (3d Cir. 1968), relied on by the majority, the defendant (Heithaus) was a co-owner, not a sole proprietor, and he did not take the forms on which the indictment was based to a government official urging that their approval be expedited. I believe that this record shows the defendant Glantzman had significantly

more knowledge of the false statements on the government forms than the record in the foregoing case disclosed was available to Heithaus. *See* United States v. Heithaus (Selikoff, appellant), 377 F.2d 484 (3d Cir. 1967), where the judgment of conviction was affirmed.