**UNITED STATES of America**

**v.**

**Charles Henry CARLSON and Dominick Bonomo.**

**Dominick Bonomo, Appellant.**

**No. 15335.**

United States Court of Appeals Third Circuit.

Argued Dec. 3, 1965.

Decided April 28, 1966.

Levan Gordon, Philadelphia, Pa., for appellant.

Jerome D. Schwitzer, Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S.

Atty., Newark, N. J., Barry D. Maurer, Asst. U. S. Atty., on the brief), for appellee.

Before HASTIE, GANEY and FREEDMAN, Circuit Judges.

GANEY, Circuit Judge.

Appellant, Dominick Bonomo, along with one Charles Henry Carlson, was indicted on September 16, 1964, in a three-count indictment. Count I charged that on or about July 15, 1964, Carlson aided and abetted by appellant, did pass and utter upon one Donald Orrick a counterfeit ten dollar bill, knowing it to have been falsely made and counterfeited, in violation of 18 U.S.C.A. §§ 472 and 2. Count II was similar to the first except that it accused Carlson with attempting to pass and utter a counterfeit ten dollar bill upon one Francis Rork. Count III charged appellant alone with the possession of six counterfeit ten dollar bills in violation of 18 U.S.C.A. § 472. Prior to trial both Carlson and appellant filed motion to suppress the eight counterfeit bills. The basis for appellant's motion was that no warrant had been issued for his arrest at the time he was apprehended, and he had not committed, nor was committing, any crime at the time of his arrest. Both motions were denied by the District Court on January 8, 1965.

After a trial, during which appellant took no exceptions to the trial judge's charge, a jury found Carlson and appellant guilty on Counts I and II. Before the case had gone to the jury, the trial court dismissed Count III because of a fatal variance, in that the serial numbers of the six counterfeit bills in that count did not correspond with the serial numbers on the bills introduced into evidence.[1] Appellant did not file motions for arrest of judgment, for judgment of acquittal or for a new trial even though he had made timely motions for judgment of acquittal at the end of the Government's case and all the evidence.

■ Appellant complains that he was not arraigned by the local authorities without unnecessary delay before the nearest available magistrate as required by New Jersey Criminal Rule 3:2–3(a),[2] and that he was denied the right of counsel. Assuming, for the purpose of argument, that his complaints are true, no federally protected rights of his were violated. There has been no showing that he was prejudiced in the delay in bringing him before a magistrate for under such circumstances it is no concern of the Federal courts if the local authorities did not abide by the State criminal rules. The rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), is not of constitutional dimension. It is applicable only to federal law enforcement officers. See United States ex rel. Smith v. State of New Jersey, 322 F.2d 810, 811 (C.A.3, 1963).

■ As to his complaint that he was not advised of his right to remain silent nor of his right to counsel at the time of his arrest, the record shows, prior to trial, the appellant made no incriminating statement to law enforcement officers, Federal or local, and he was represented by counsel of his choice at arraignment and assigned counsel at trial. When appellant took the stand at his trial, he was asked on cross-examination whether the local police authorities had requested him to make a statement with regard to the circumstances surrounding the counterfeit bills. His answer was: "Well, they asked me if I had anything

1. As set forth in Count III of the indictment, the serial numbers of the six bills possessed by Dominick Bonomo, the appellant, were B20175986I, whereas the serial numbers on each of the bills received in evidence were B210759861. In other words, two numbers "1" and "0" were transposed in the indictments.

2. This rule provides: "(a) Appearance. * * * A person making an arrest without a warrant shall take the arrested person, without unnecessary delay, before the nearest available magistrate * * *." (N.J.S.A. 3:2–3(a)).

to do with this and I told them no." That was the sum of the evidence about any prior incriminating statements, made by appellant, at the trial. He cannot validly complain of the lack of counsel. See Commonwealth of Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22, 28, n. 9 (C.A.3, 1965).

■ Appellant's main point on this appeal is that the evidence adduced at the trial was insufficient to convict him of aiding and abetting Carlson under Counts I and II of the indictment. Before ruling on this point, we must answer his claim that evidence of the six bills in the white envelopes should have been suppressed prior to trial in accordance with his motion. We have no doubt that "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. State of Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). Without such evidence we do not see how the jury could have convicted him under the first two counts. At the trial appellant denied ever having in his possession or seeing the six bills prior to his arrest. This testimony, however, does not prevent him from requesting that evidence of the bills be suppressed. Jones v. United States, 362 U.S. 257, 261–264, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960).

■ Appellant was arrested by local authorities without a warrant. The Fourth Amendment regarding search and seizure applies to the states. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961); Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The search of a person and the seizure of incriminating evidence may be made as the result of a lawful arrest. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The evidence obtained thereby, if not excludable by other rules of evidence, is admissible in evidence at the trial of that person. The lawfulness of an arrest must be based upon probable cause. "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense had been committed or is being committed." Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949), quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. Also see Ker v. State of California, supra, at 34–35, 83 S.Ct. 1623. "[T]he reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment." Ker v. State of California, supra, at 33, 83 S.Ct. at 1630.

■ We think the facts, which will be set forth later, proved at the trial, support the ruling of the District Court denying the motion to suppress, and that the six bills were admissible as evidence against appellant.

At the trial, evidence to show the existence of the following facts was produced: On July 15, 1964, Orrick was vending hot dogs from a truck on the west side of Westside Avenue near Armstrong Avenue in Jersey City, New Jersey. At about 11:00 a. m., Carlson, accompanied by appellant, approached the truck and asked Orrick for three hot dogs which he prepared and handed to Carlson. The latter, while appellant was standing behind him, handed Orrick a counterfeit ten dollar bill and received $9.40 in change. Immediately after Carlson and appellant walked away and were out of sight, Orrick examined the ten dollar bill, and upon his realizing that it was not genuine, went to the tavern across the avenue from where he telephoned the Jersey City police. Approximately 10–15 minutes later, Sergeant Raymond Dillman accompanied by another police officer patrolling the Fifth Precinct appeared in a police car equipped with a radio

transmitter and receiver. Orrick turned the counterfeit ten dollar bill over to the sergeant and furnished him with both the facts surrounding its receipt and a description of Carlson and the appellant. Sergeant Dillman thereupon, between 11:00 and 11:30 a. m., broadcast an alarm over the police radio system requesting the police to be on the lookout and to apprehend two men who had been accused of passing a counterfeit ten dollar bill at the hot dog stand near Westside and Armstrong Avenues. As part of the alarm, he gave a brief description of the two men and their wearing apparel.

While they were patrolling the west end of the Fourth Precinct of Jersey City by car, Detective-Sergeant Arthur R. Kelly and Detective Ambrose E. Artaserse heard the alarm from the car's radio receiver about the two men wanted for passing counterfeit money. Around noontime, Dillman turned the bogus ten dollar bill he had received from Orrick over to Lieutenant Daniel Carroll, the officer then in charge of the Fifth Precinct police station. Before doing so, Dillman affixed his initials and the day's date to the face of the bill and two x's on the back.

About 12:50 p. m., the two detectives saw Carlson and appellant walking together in a northerly direction on the east side of Westside Avenue at Clinton Avenue. They fitted the description given over the police radio system. The detectives followed them for about five blocks, but always stayed one block behind them. When the two suspects reached Bentley Avenue, they stopped, appeared to have a brief conversation, and then separated. Carlson crossed Westside Avenue and walked in a northerly direction on the east side of the Avenue, while appellant continued in the same direction and stayed abreast of Carlson.

When the two suspects separated, Artaserse got out of the car and followed appellant afoot on the east side of the Avenue. Kelly, in the meantime, drove his car past appellant and turned left in-to Belmont Avenue, parked fifty feet from the corner, got out of the car and waited for Carlson to appear. As Kelly had anticipated, Carlson headed for the mobile hot dog vendor's stand operated by Rork and located on the east side of Westside near Belmont Avenue at the entrance to Lincoln Park. Kelly thereupon headed from his vantage point for the same place.

On arriving at the stand, Carlson ordered two hot dogs which Rork promptly prepared and placed on the side of the stand near Carlson. While the latter was handing a counterfeit ten dollar bill (which did not appear genuine to Kelly) to Rork in payment for the food, Kelly apprehended Carlson and seized the bill before it got into the hands of Rork. With Carlson offering no resistance and under arrest, Kelly yelled over to Artaserse who was still following appellant on the east side of Westside Avenue: "Andy, I've got him. Get him." At the time appellant was about 150–170 feet away from the hot dog stand, and Artaserse was 10–15 feet behind appellant.

Artaserse then approached appellant, identified himself as a police officer and asked appellant for some identification, which he produced. Appellant then asked the officer to show his police badge again, and the latter obliged. While appellant was looking at the badge, the officer observed a white envelope in his hand and asked him what it was. In response, appellant struck the officer in the stomach with his elbow and then turned to move away. The officer put a bear hug on him, and during the ensuing scuffle, he saw the white envelope leave appellant's hand. After being kicked in the shin by appellant, the officer drew his service revolver from the holster and pointing it at him, asked appellant whether he wanted to get shot or submit to arrest. After putting handcuffs on him, the officer gave a quick glance on the ground for the white envelope, but could not see it. He, thinking it more prudent to get appellant to the police station than waste time looking for the envelope, took appellant to where

Kelly was parked in his car with Carlson handcuffed in the back seat. Kelly then drove all three to the Fourth Precinct police station. The trip consumed about ten minutes.

Upon being informed by Artaserse about appellant's discarding of the white envelope, Kelly immediately ordered Artaserse to return to the scene where appellant was arrested and try to find the envelope. Artaserse did so and found the envelope under a parked car in the east curb lane of Westside Avenue. The envelope contained six counterfeit ten dollar bills, each identical in appearance and serial number with the one Carlson had passed to Orrick and the one he had attempted to pass to Rork. Without wasting any time, Artaserse returned to the police station and before handing the envelope and the six bills over to Detective-Sergeant Kelly, he wrote the following notation on each bill: "Detective A. E. Artaserse, Shield 107, 7–15–64."

Kelly called the police station of the Fifth Precinct and asked them to deliver to him the bill which Carlson had transferred to Orrick. When he received it, he affixed his own signature and the date to it. He also put the following notation on the bill that he had intercepted from Carlson: "A.R.K., III, 1.05 P.M., 7–15–64." After showing the bills to a Secret Service agent, Kelly put them in his private locker at the police station and did not remove them until the following day. On that day he delivered them to the Jersey City Municipal Court, Part I, where appellant was given a hearing. After the hearing, which was continued to July 20, 1964, Kelly transferred the bills to Agent Pat O'Callaghan of the Secret Service, who produced them at the trial.

It is submitted here that there was sufficient evidence offered by the Government to warrant conviction by the jury on both counts of the indictment.

■■■■■ It must be kept in mind that the weight and credibility to be attached to the testimony of the witnesses is a matter for the trier of the facts and we are required to take that view of the evidence most favorable to the Government. United States v. Bailey, 7 Cir., 277 F.2d 560, 566; United States v. Detente, 7 Cir., 199 F.2d 286.

■■■■■ The principal thrust of the appellant's argument on the facts hereinabove set forth was that the Government did not prove beyond a reasonable doubt that the appellant was guilty of aiding and abetting in the commission of this offense. While it is conceded that the mere passing of counterfeit bills by an individual is not sufficient to show knowledge on the part of the defendant that they were counterfeit, United States v. Litberg, 7 Cir., 175 F.2d 20, nevertheless, the question of guilty knowledge and especially the intent to defraud since it can rarely be shown by direct evidence, it is well-established that such elements may be shown by other than direct evidence. United States v. Platt, 7 Cir., 156 F.2d 326 at 327. The jury here had every right to scrutinize the entire conduct of the defendant at or near the time when the alleged actual passing of the counterfeit notes was being done by Carlson and it is submitted there was more than sufficient evidence here to connect the defendant as an aider and abettor. As pointed out by the Government, from the presence of the defendant with Carlson at the time of the passing of the first counterfeit bill and his continued association with him for the balance of the morning, and his actions at the time of Carlson's second attempt to pass a counterfeit bill and his possession of six identical counterfeit bills, together with his brawling with the officer in order to try to discard them at the time of his arrest, the jury could properly infer that the defendant was aiding and abetting Carlson in the commission of the offense. United States v. Garguilo, 2 Cir., 310 F.2d 249; United States v. Kelley, 7 Cir., 186 F.2d 598, 602; United States v. Sahadi, 2 Cir., 292 F.2d 565.

Accordingly, the judgment of the District Court will be affirmed.